# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CHARGE INJECTION TECHNOLOGIES, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. N07C-12-134-JRJ |
| E.I. DUPONT DE NEMOURS & COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

## OPINION

Date Submitted: December 11, 2015
Date Decided: March 9, 2016

*Upon Defendant E. I. DuPont De Nemours & Company's Motion to Dismiss*:
**DENIED.**

Arthur G. Connolly, III, Esquire, Ryan P. Newell, Esquire, Josiah R. Wolcott, Esquire, Connolly Gallagher LLP, The Brandywine Building, 1000 West Street, Suite 1400, Wilmington, DE 19801, Amir H. Alavi, Esquire (*pro hac vice*) (argued), Timothy C. Shelby, Esquire (*pro hac vice*), Lauren R. Reeder, Esquire (*pro hac vice*), Ahmad, Zavitsanos, Anaipakos, Alavi & Mensing P.C., 1221 McKinney, Suite 3460, Houston, TX 77010, Attorneys for Plaintiff Charge Injection Technologies, Inc.

Kathleen F. McDonough, Esquire (argued), John A. Sensing, Esquire, Michael B. Rush, Esquire, Potter Anderson  & Corroon LLP, 1313 North Market Street, P.O. Box 951, Wilmington, DE  19801, Attorneys for Defendant E. I. du Pont de Nemours & Company.

**Jurden, P.J.**

# I. INTRODUCTION

Before the Court is Defendant E.I. Du Pont De Nemours and Company's ("DuPont") Motion to Dismiss.[1] In 2007, Charge Injection Technologies, Inc. ("CIT") instituted this suit against DuPont, alleging that DuPont wrongfully used and disclosed CIT's proprietary and confidential technology. Several years into the litigation, CIT entered into a financing agreement. DuPont alleges that the financing agreement violates Delaware's prohibition against champerty and maintenance, and therefore, CIT's claims against DuPont must be dismissed. For the reasons set forth below, DuPont's Motion to Dismiss based on champerty and maintenance is **DENIED.**

# II. BACKGROUND

CIT filed suit against DuPont in December 2007, alleging that DuPont wrongfully used and disclosed CIT's proprietary and confidential technology.[2] Lacking adequate resources to pursue what became costly and protracted litigation, Ross James ("James"), CIT's Chief Executive Officer, sought third-party financing in 2008 to help cover the costs of this litigation as well as other business expenses.[3]

CIT entered into two separate agreements—one with Latigo IP, LLC

---

[1] Defendant E.I. Du Pont De Nemours and Company's Opening Brief in Support of its Motion to Dismiss ("Def.'s Mot. Dismiss") (Trans. ID. 57739103).

[2] Third Am. Compl. ¶ 1 (Trans. ID. 29596891).

[3] Plaintiff Charge Injection Technologies, Inc.'s Brief in Opposition to Defendant DuPont's Motion to Dismiss at 3 ("Pl.'s Opp'n") (Trans. ID. 57854661); Def.'s Mot. Dismiss, Ex. A Declaration of Ross James ¶¶ 2–3 ("James Decl."). Ross James has been the Chief Executive Officer of CIT since 2000. James Decl. ¶ 1.

("Latigo") and one with Fortitude Advisors ("Fortitude")—pursuant to which Latigo and Fortitude would assist CIT with securing third-party financing.[4] Frank Knuettel ("Knuettel") is CIT's primary contact with Latigo, and Chris Wilson ("Wilson") is CIT's primary contact with Fortitude.[5]

In 2010, Wilson contacted Burford Capital LLC,[6] an investment advisor that conducts due diligence for Burford Capital Ltd., a United Kingdom company that provides litigation financing ("Burford").[7] Wilson spoke with Aviva Will ("Will"), the Managing Director at Burford.[8] After providing Burford with non-confidential information about the litigation, CIT and Burford entered into a non-disclosure agreement.[9] Although Burford and CIT had preliminary discussions about potential financing in 2010, no formal negotiations took place at that time because Burford decided not to fund the litigation.[10]

On October 31, 2011, CIT's original counsel withdrew.[11] While CIT was searching for new counsel, Wilson contacted Will again to see if Burford might

---

[4] James Decl. ¶¶ 20–21, 25–28. In exchange for their services, Latigo and Fortitude would earn fees upon a third-party's financing of this litigation. *Id.*

[5] *Id.*

[6] Burford Capital LLC was then known as Burford Group LCC. Def.'s Mot. Dismiss, Ex. C Deposition of Aviva Will at 21–22 ("Will Dep.").

[7] *Id.* at 21–22, 27–28; Def.'s Mot. Dismiss, Ex. B Deposition of Ross James at 49–52 ("Def.'s Ex. B James Dep."). This Opinion will refer to both entities as "Burford."

[8] Def.'s Ex. B James Dep. at 49–52; Will Dep. at 28–29. As Managing Director at Burford Capital LLC, Will is responsible for underwriting and monitoring investments. Will Dep. at 20–21.

[9] Will Dep. at 30–37.

[10] *Id.* at 47–49.

[11] *See* Trans. ID. 40632788.

reconsider its financing decision.[12] At that time, Burford's "portfolio was larger and more diverse," and Burford was willing to take "a more substantive look" at the case.[13] Burford spent several months conducting due diligence, which included discussions with CIT's potential new counsel, Ahmad, Zavitsanos, Anaipakos, Alavi & Mensing ("AZA"), and with CIT regarding the potential financing terms.[14] On December 1, 2011, CIT's current lead counsel, AZA entered its appearance in the case.[15]

Following negotiations between CIT and Burford, a financing agreement was finalized on June 15, 2012, subject to approval from CIT's Board of Directors and Burford's Board of Directors.[16] CIT's Board of Directors and Burford's Board of Directors approved the deal, and CIT entered into the "Forward Purchase Agreement" ("FPA") with Aloe Investments Limited ("Aloe"), a subsidiary of Burford.[17] Pursuant to the FPA, Aloe provided financing in exchange for a percentage of any future proceeds of the litigation and obtained a security interest in CIT's claim as collateral.[18]

---

[12] Will Dep. at 49, 53–55.

[13] *Id.* at 80–82.

[14] *Id.* at 55–61, 82. Will initially spoke with Wilson but also spoke with James and Gary Benton, CIT's outside legal advisor. *Id.* at 59–63.

[15] *See* Trans. ID. 41184823; Trans. ID. 41143308; Trans. ID. 52178115.

[16] Will Dep. at 68–71.

[17] *Id.* at 24–26, 88–101; Def.'s Mot. Dismiss, Ex. D, E.

[18] Def.'s Mot. Dismiss Ex. G Forward Purchase Agreement. AZA is representing CIT on a contingency basis. Pl.'s Opp'n at 6.

## III. STANDARD OF REVIEW

The common law doctrines of champerty and maintenance originated in Medieval England in response to the practice of feudal lords and other wealthy individuals financing other individuals' legal claims, usually against the financier's political or personal enemies, in exchange for a share of the results.[19] These "champertors" enlisted paid retainers—known as "maintainers"—who would prosecute the suits ruthlessly on the champertors' behalf.[20] Such claims often involved title to land, which meant that the champertor would grow richer by becoming a joint owner of the landed estate.[21]

"Because kings soon found themselves the target of this vexatious litigation, and because of a [ ] distaste for litigation in general, laws against champerty and maintenance were born."[22] The historical justification for prohibiting any form of champerty or maintenance was to prevent disinterested third-parties from stirring

---

[19] *Osprey, Inc. v. Cabana Ltd. P'ship*, 532 S.E.2d 269, 374–75 (2000); Andrew Hananel & David Staubitz, *The Ethics of Law Loans in the Post-Rancman Era*, 17 GEO. J. LEGAL ETHICS 795, 797–98 (2004); Ronald C. Minkoff & Andrew D. Patrick, *Taming the Champerty Beast: A Proposal for Funding Class Action Plaintiffs*, 15 PROF. LAW. 1, Spring 2004 at 1.

[20] Minkoff & Patrick, *supra* note 19, at 1; *Osprey*, 532 S.E.2d at 374–75; Ari Dobner, *Litigation for Sale*, 144 U. PA. L. REV. 1529, 1544 (1996) ("[T]he word 'champerty' derives from champart, a type of feudal tenure in land that lent itself most easily to the evasion of the laws against usury.").

[21] *Osprey*, 532 S.E.2d at 374–75; Minkoff & Patrick, *supra* note 19, at 1; Dobner, *supra* note 20, at 1544 ("One particularly pernicious practice was the selling or assigning of a pretended right in land to persons of great power or influence, who would use their rank to further the prosecution of their lawsuits and oppress the possessors of the lands. This problem was exacerbated where trial by combat prevailed and litigants assigned their claims to champion fighters.").

[22] Minkoff & Patrick, *supra* note 19, at 1.

up or encouraging fraudulent and frivolous lawsuits.[23]

Although CIT maintains that Delaware no longer recognizes the doctrines of champerty and maintenance,[24] "[a]bsent a ruling from the Delaware Supreme Court holding that [the] doctrines are dead, this Court will continue to recognize them."[25]

Under Delaware law, champerty is a type of maintenance defined as "an agreement between the owner of a claim and a volunteer that the latter may take the claim and collect it, dividing the proceeds with the owner, if they prevail; the champertor to carry on the suit at his own expense."[26] "In a champertous assignment, an assignee of a cause of action initiates litigation at his or her own risk and expense in consideration of receiving a portion of the proceeds if successful."[27] "Champerty cannot be charged against one with an interest in the matter in controversy,"[28] and "[a]n agreement is not champertous where the assignee has some legal or equitable interest in the subject matter of the litigation

---

[23] Susan Lorde Martin, *Syndicated Lawsuits: Illegal Champerty or New Business Opportunity?*, 30 AM. BUS. L.J. 485, 487 (1992); *Modern Views of Champerty and Maintenance*, 18 HARV. L. REV. 222, 222–23 (1905) ("The object was to prevent intimidation of the courts by the great lords, who by enlisting in suits in which they had no proper interest, overawed courts and juries, and perverted 'the remedial process of the law into an engine of oppression.'").

[24] Pl.'s Opp'n at 10–13.

[25] *Charge Injection Techs., Inc. v. E.I. DuPont de Nemours & Co.*, 2014 WL 891286, at *3 (Del. Super. Feb. 27, 2014) *appeal refused sub nom.*, 89 A.3d 476 (Del. 2014).

[26] *In re Emerging Commc'ns, Inc. Shareholders Litig.*, 2004 WL 1305745, at *29 (Del. Ch. 2004); *Hall v. State*, 655 A.2d 827, 829 (Del. Super. 1994).

[27] *Hall*, 655 A.2d at 830.

[28] *In re Emerging Commc'ns, Inc.*, 2004 WL 1305745, at *29.

independent from the terms of the assignment under which the suit was brought.[29]

Maintenance "is an officious intermeddling in a suit which in no way belongs to the intermeddler by maintaining or assisting either party to the action, with money or otherwise, to prosecute it or defend it."[30] Stated differently, it is "the intermeddling in a suit by a stranger, one having no privity or concern in the subject matter and standing in no relation of duty to the suitor."[31]

## IV.  DISCUSSION

### A.  Champerty

CIT maintains that the FPA is not champertous because CIT did not assign its claims to Aloe and did not "seek a bargain with a third party to carry on the litigation in CIT's absence at the third party's own risk and expense in consideration of receiving part of the proceeds."[32] DuPont argues that whether the FPA constitutes champerty does not depend on a formal assignment because CIT is no longer the "real party in interest."[33] According to DuPont, the FPA is champertous because it provides Burford, a disinterested third-party, with *de facto* control over the litigation.[34] DuPont maintains that "CIT has signed away all

---

[29] *Hall*, 655 A.2d at 829; *Street Search Partners, L.P. v. Ricon Int'l, L.L.C.*, 2006 WL 1313859, at *3 (Del. Super. 2006); J. Travis Laster, *Goodbye to the Contemporaneous Ownership Requirement*, 33 DEL. J. CORP. L. 673, 683 (2008).
[30] *Hall*, 655 A.2d at 829 (citing *Bayard v. McLane*, 3 Del. 139, 208 (1840)).
[31] *Id.*
[32] Pl.'s Opp'n at 15–16.
[33] Def.'s Mot. Dismiss at 12–14, 24–25.
[34] *Id.*

rights to litigation proceeds, and has no real interest remaining in this litigation," because, if successful, Burford has the right to collect "any judgment." [35]

CIT and DuPont have identified two cases in Delaware that were dismissed based on the champertous assignment of a claim. In *Hall v. State*, a prisoner assigned his claim for the return of seized property to another prisoner. The assignee then brought suit against the State seeking the return of the property.[36] The Court dismissed the suit finding the assignment void as champertous because the assignee had no legal or equitable interest in the subject matter of the litigation prior to the assignment, the assignee endeavored to carry on the litigation at his own risk and expense, and the assignee was attempting to enforce a claim which the assignor, the true owner of the claim, did not care to prosecute.[37]

In *Street Search Partners, L.P. v. Ricon International, LLC*,[38] the plaintiff, Street Search Partners, L.P. ("Street Search"), encountered financial difficulties and assigned its interest in the litigation to A & R Investment Associates LP

---

[35] *Id.* at 14, 24.

[36] *Hall*, 655 A.2d at 830.

[37] *Id.* at 829–31. In *Hall*, the Court distinguished the transaction from legitimate assignments of contract rights, stating, "[i]t should be noted that this decision in no way affects an assignee's ability to enforce contracts, notes, mortgages and financial instruments in general." *Id.* at 831. Similarly, in *Kingsland Holding, Inc. v. Bracco*, the Court of Chancery distinguished between the assignment of a claim and the assignment of a judgment for valuable consideration. 1996 WL 104257, at *5 (Del. Ch. 1996). The Court noted that assigning a judgment for valuable consideration is more akin to assigning a contract, note or financial instrument, which Courts recognize as valid assignments. *Id.*

[38] 2006 WL 1313859 (Del. Super. 2006).

("A & R").[39]  A & R then filed a motion to intervene as assignee-in-interest for the purpose of pursuing Street Search's claims.  In considering whether the assignment was champertous, the Court noted "[t]he law clearly requires a *legal* interest in the litigation to avoid champerty."[40]  The Court held that the assignment of the claim was champertous because neither A & R's interest as an investor in Street Search's management company nor Street Search's debt to A&R provided A & R with a legal interest in the subject matter of the litigation.[41]

The Court is not persuaded by DuPont's argument that the FPA is champertous because of Burford's alleged "*de facto* control."  The record before the Court demonstrates that CIT is the bona fide owner of the claims in this litigation, and Burford has no right to maintain this action.[42]  In this case, there was no assignment.  Neither the FPA nor the Security Agreement assigns ownership of CIT's claims against DuPont to Burford.

The doctrine of champerty "is based upon the ground that no encouragement should be given to litigation by the introduction of a party to enforce those rights

---

[39] *Id.* at *3.
[40] *Id.* at *4.
[41] *Id.* at *4–5.
[42] *Drake v. Nw. Nat. Gas Co.*, 165 A.2d 452, 454 (1960); *Gibson v. Gillespie*, 152 A. 589, 593 (Del. Super. 1928) ("[I]f the plaintiff in a suit at law had an interest in the cause of action prior to and independent of the alleged champertous assignment or agreement, he has a right to maintain the action. He is not then a volunteer or meddler in stirring up litigation in which he has no legal or proper interest."); *Bayard*, 3 Del. at 139 ("The English statutory offence of champerty (to which the earliest Delaware laws on this subject refer) is maintenance not merely for a part, but at the *expense* of the champertor.").

which the owners are *not disposed to prosecute*."[43]  CIT did not bargain with Burford to enforce claims which CIT is not disposed to prosecute.  Rather, § 3.3 of the FPA expressly states:

> [Aloe] is not, and does not by virtue of entering into this Agreement become, a party to the Litigation Claim nor does [Aloe] have any rights as to the direction, control, settlement or other conduct of the Litigation Claim . . . [and CIT] retains the unfettered right to settle the Litigation Claim at any time for any amount.

## B. Maintenance

Maintenance involves the officious intermeddling in a suit, "for the purpose of stirring up ligation and strife, encouraging others to bring actions or make defenses that they have no right to make."[44]  CIT argues that Burford is not an officious intermeddler because CIT sought out Burford (not the other way around), CIT did not enter the FPA until four years after it initiated suit, and Burford is not directing or controlling the litigation.[45]  DuPont argues that Burford is an officious intermeddler because Burford has "no bona fide interest" in the litigation, and by providing financing, Burford is impermissibly prosecuting the lawsuit.[46]  According to DuPont, Burford has impermissibly taken control over the litigation because: (1) Burford has assumed control over CIT's ability to choose its own

---

[43] *Gibson*, 152 A. at 593 (emphasis added).

[44] *Champerty and Maintenance* § 1, 5B AM. JUR. PL. & PR. FORMS (2015); *Bayard*, 3 Del. at 208 (noting that maintenance involves "an unlawful taking in hand or upholding quarrels or sides, to the disturbance or hindrance of common right.").

[45] Pl.'s Opp'n at 16–19.

[46] Def.'s Mot. Dismiss at 15–16.

counsel because under the FPA, CIT can only replace AZA under limited circumstances;[47] and (2) the FPA takes away CIT's incentive to settle because "CIT realistically cannot agree to a settlement unless it ensures that the offer is large enough that Burford and AZA get paid in full."[48]

An "officious intermeddler" is "[s]omeone who confers a benefit on another without being requested or having a legal duty to do so, and who therefore has no legal grounds to demand restitution for the benefit conferred."[49] The Court finds that Burford is not an officious intermeddler, and therefore, the arrangement does not constitute maintenance. This is not a case in which Burford "stirred up" litigation, is controlling or forcing CIT to pursue litigation, or is controlling the litigation for the purpose of continuing a frivolous or unwanted lawsuit.[50]

CIT's principal asset was and still is its intellectual property rights in its patented charge injection electrospinning technology, which CIT alleges DuPont wrongfully used, disclosed, and misappropriated, thereby causing CIT's financial

---

[47] *Id.* at 28–29.

[48] *Id.* at 17–29.

[49] *Officious Intermeddler*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[50] The doctrine of maintenance was "developed at common law to prevent officious intermeddlers from stirring up strife and contention by vexatious and speculative litigation which would disturb the peace of society, lead to corrupt practices, and prevent the remedial process of law." Kerry M. Diggin, *Champerty, Maintenance, Ect.* § 1, 14 AM. JUR. 2D (2016). *See also Hannigan v. Italo Petroleum Corp. of Am.*, 178 A. 589, 590 (Del. Super. 1935); *Gibson*, 152 A. at 594 ("There is an utter absence of evidence showing that the plaintiff was guilty of stirring up litigation, or of officious intermeddling in the suit before the court. On the contrary, it appears from the uncontradicted evidence that the plaintiff had, or honestly believed he had, a substantial and legal interest in the note, and that suit was brought thereon to protect his own interest as well as the interest of the company.").

constraints.[51] CIT began pursuing third-party financing in 2008 to help cover the costs of its litigation against DuPont (as well as other business expenses) because CIT felt strongly that it had been wronged by DuPont but lacked adequate resources to pursue protracted litigation.[52] Unable to obtain third-party financing in 2008, CIT continued to pursue the litigation, eventually entering into agreements with Latigo and Fortitude to assist in finding potential sources of financing.[53]

The FPA was freely negotiated.[54] The FPA does not give Burford any right either to direct, control, or settle CIT's claims against DuPont. And, under the FPA, the financing can be used for litigation expenses as well as other business

---

[51] Third Am. Compl. ¶¶ 144–54. CIT filed this action against DuPont in 2007, alleging that DuPont "engaged in a coordinated pattern of deception aimed at concealing their wrongful activities, misappropriated trade secrets and proprietary information belonging to CIT, wrongfully disclosed CIT's technology by way of patent application with the U.S. Patent Office, and improperly deprived CIT of prospective revenues and royalties . . . ." *Id.* ¶¶ 1–2.

[52] James Decl. ¶¶ 2–3; Def.'s Ex. B James Dep. at 8–10; Will Dep. at 119–22.

[53] In 2008, James personally searched for financing through various banks, but was ultimately unsuccessful. Pl.'s Opp'n, Ex. C Deposition of Ross James at 9–10, 70 ("Pl.'s Ex. C James Dep."). This case is now in its ninth year, and the parties have expended considerable time and resources litigating a multitude of discovery disputes and this potentially dispositive issue. On more than one occasion, CIT has told the Court that DuPont is trying to wear it down. *See e.g.*, Pl.'s Opp'n at 3 ("CIT quickly found that it lacked adequate resources to pursue long, drawn-out litigation against **DuPont, which has tens of billions of dollars at its disposal to wage a war of attrition against litigation adversaries**.") (emphasis added).

[54] In 2010, in addition to Burford, CIT also spoke with several other startup companies interested in potentially providing financing. Pl.'s Ex. C James Dep. at 70. Benton, CIT's outside legal advisor, was CIT's primary negotiator. *Id.* at 60–61. CIT was involved in the negotiations of the FPA, including discussions about the financing amounts and repayment terms, litigation budgets, timing of expenditures, and the parties risk assessment of the merits of the case. Other individuals involved in the negotiations include James, Wilson, Knuettel, and Roger Wiegley, a member of CIT's Board of Directors. James Decl. ¶¶ 12, 23, 28–52; Will Dep. at 63. *See e.g.*, James Decl. ¶ 42 ("During that time, [Mr. Wilson] was communicating with me and Mr. Benton to make sure that changes CIT sought to the agreement were made and was assisting in the rendition of legal advice to CIT.").

expenses.[55] The FPA specifically states that Aloe is not a party to the litigation, Aloe does not have "any rights as to the direction, control, settlement or other conduct of the litigation," and CIT "retains the unfettered right to settle the [litigation] at any time for any amount."[56] In addition, James testified that: (1) "CIT controls the litigation claim;"[57] (2) as CIT's CEO, he is the decision maker with regard to the DuPont litigation; and (3) Burford has not participated in any mediation sessions between CIT and DuPont.[58] Will testified that Burford does not represent CIT or control the litigation,[59] and that Burford has not reviewed DuPont's confidential information.[60] The Court does not find the arrangement constitutes maintenance.

## V. CONCLUSION

For the foregoing reasons, Defendant E. I. DuPont De Nemours & Company's Motion to Dismiss based on champerty and maintenance is **DENIED.**

**IT IS SO ORDERED.**

_____
Jan R. Jurden, President Judge

---

[55] Will Dep. at 119–22.
[56] Def.'s Mot. Dismiss, Ex. G Forward Purchase Agreement § 3.3.
[57] Pl.'s Ex. C James Dep. at 27; Def.'s Ex. B James Dep. at 190–193.
[58] Pl.'s Ex. C James Dep. at 22–23, 152.
[59] Will Dep. at 72. In response to questioning about why the FPA contains a provision relating to CIT's ability to choose its own counsel, Will stated, "[t]he choice of lawyers, who the clients' lawyers are, is critical to our assessment of the case. We don't lawyer the case. We don't represent the client. We don't control the case. So it's important that we have confidence in the lawyers who are litigating the case . . . ." *Id.*
[60] *Id.* at 36–37.